RECEIVED

JUL 1 8 2008

AT 8:30_____M
WILLIAM T. WALSH
CLERK

## IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

---

MICHAEL S. CRAIG AND BILLIE R. CRAIG,    :

           Plaintiffs,    :

vs.    :

DAVID T. NORTON, J.B. HUNT
TRANSPORT, INC. DAVID DePUE a/k/a
LEHIGH VALLEY FLEET
MAINTENANCE, LEHIGH VALLEY
FLEET MAINTENANCE, LTD, LEHIGH
VALLEY TRAILER SERVICE a/k/a
LEHIGH VALLEY FLEET
MAINTENANCE, J. ROSS, AUSTIN
FLEET MAINTENANCE, INC. and/or
AUSTIN FLEET MAINTENANCE, ABC
COMPANY 1-5 AND JOHN DOES 1-5    :

           Defendants    :

---

CIVIL ACTION NO.: 3:06-CV-1981(JAP)

**JOINT PRE-TRIAL ORDER**

---

This matter having come before the Court for a pretrial conference pursuant to Fed. R.

Civ. P. 16; and Robert C. Ward, Esq. and Joseph F. Trinity, Esq. having appeared for plaintiffs,

and Jon M. Dumont, Esq. and Dawn L. Jennings, Esq., having appeared for defendants JB Hunt

Transport, Inc., J. Ross and David T. Norton; and Michael Kearns, Esq., having appeared for

defendants David DePue a/k/a Lehigh Valley Fleet Maintenance, Lehigh Valley Fleet

Maintenance, LTD., Lehigh Valley Trailer Service a/k/a Lehigh Valley Fleet Maintenance; and

John L. Slimm, Esq. and Dante Rohr, Esq, having appeared for defendants Austin Fleet

Maintenance and Austin Fleet Maintenance, Inc.; the following Final Pretrial Order is hereby

entered:

1

**1. JURISDICTION** (set forth specifically).

**PLAINTIFFS:**

This action is a civil action wherein jurisdiction is founded upon diversity of citizenship,

the amount in controversy being in excess of $75,000.00 exclusive of interest and costs as

specified in 28 U.S.C.A. §1332(a).

**DEFENDANT LEHIGH VALLEY FLEET MAINTENANCE, LTD., AND DAVID
DePUE:**

Defendants, Lehigh Valley Fleet Maintenance, Ltd., and David DePue, deny that the

Plaintiffs claims, as have been set forth, rise to a level sufficient to support federal jurisdiction.

**2. PENDING/CONTEMPLATED MOTIONS** (Set forth all pending or contemplated motions,
whether dispositive or addressed to discovery or to the calendar. Also, set forth the nature of the
motion and the return date. If the Court indicated that it would rule on any matter at pretrial,
summarize that matter and each party's position). *All motions, unless otherwise noted, are to be
filed by 8/11/08. Opposition due 8/25/08;
Hearing date 9/8/08 at 10 AM*

**PLAINTIFFS:**

Plaintiffs' motion for reconsideration of an Order denying plaintiff's motion to amend its

complaint to assert punitive damages as to defendant JB Hunt.  The motion has been briefed and

the parties are awaiting the Court's decision

Plaintiffs may file relevant *in limine* motions regarding evidentiary issues and on liability,

including but not limited to motions concerning destruction/spoliation of evidence by defendant

J.B. Hunt, and the admissibility of evidence of improper maintenance of the right wheel

assembly area as relevant to the improper maintenance of the left wheel assembly area.

2

**DEFENDANTS, J.B. HUNT, J. ROSS AND DAVID NORTON:**

Defendants, J.B. Hunt, J. Ross and David Norton, may file motions *in limine* in accordance with the Court's March 11, 2008 Order Noticing Trial, which sets forth a motion deadline of August 11, 2008.   See also, issues raised under No. 6C (Defendants' objections to plaintiffs' witnesses);  No. 8B (Defendants' objections to plaintiffs' expert witnesses); and No. 12 (Defendants' Legal Issues). Contemplated motions include motions to preclude or limit the testimony of witnesses proposed by the other parties.  Defendants also request that liability and damages be bifurcated (see No. 17).

**DEFENDANTS LEHIGH VALLEY FLEET MAINTENANCE, LTD., AND DAVID DePUE:**

Defendants, Lehigh Valley Fleet Maintenance, Ltd., and David DePue, have filed a Notice of Motion for Summary Judgment in accordance with scheduling guidelines previously set by the District Court. That dispositive application remains pending for decision. Pending a decision on the foregoing Notice of Motion for Summary Judgment, Defendants, Lehigh Valley Fleet Maintenance, Ltd., and David DePue, anticipate the filing of the following in limine motions:

1.  Barring the expert reports/opinions of Mr. King, Mr. Meyer and Mr. Ketcham  in accordance with Federal Rule of Evidence 702 and the Net Opinion Rule;

2.  Barring the proposed introduction of expert testimony in the form of rebuttal opinion as a violation of the January 22, 2008, Order of the District Court.

3.  Barring specific claims upon spoliation and/or destruction of evidence grounds

3

**DEFENDANTS AUSTIN FLEET MAINTENANCE**

Defendant AFM has filed a Motion for Summary Judgment in accordance with scheduling guidelines previously set by the District Court. That dispositive application remains pending for decision.

Defendant AFM anticipates the filing of the following in limine/pretrial motions:

(a) Barring the expert reports/opinions of Mr. King, Mr. Ketcham and Mr. Crandall in accordance with Federal Rule of Evidence 702 and the Net Opinion Rule;

(b) Barring the proposed introduction of expert testimony of\Mr. King, Mr. Ketcham and/or Mr. Crandall as beyond the scope of their reports. *at trial*

(c) Barring testimony or evidence of conditions relating to the right rear wheel assembly for purposes of establishing the condition of the left rear wheel assembly.

(d) Seeking sanctions against JB Hunt based upon spoliation and/or destruction of evidence grounds.

(e) AFM may file a motion to bifurcate trial to have the issues of damages and liability tried separately.

(f) AFM may file motions in limine in accordance with the Court's March 11, 2008 Order Noticing Trial, which sets forth a motion deadline of August 11, 2008. See also, issues raised under No. 6C (Defendants' objections to plaintiffs' witnesses); No. 8B (Defendants' objections to plaintiffs' expert witnesses); and No. 12 (Defendants' Legal Issues). Contemplated motions include motions to preclude or limit the testimony of witnesses proposed by the other parties.

4

3. **STIPULATION OF FACTS** (Set forth in narrative form a comprehensive listing of all uncontested facts, including all answers to interrogatories and admissions, to which there is agreement among the parties).

~~SUBMITTED BY PLAINTIFFS~~ – $\mathcal{NB}$

On September 16, 2005, at approximately 1:45 P.M., David Norton was driving a 2004 Freightliner owned by J. B. Hunt on Interstate 78 west in Bethlehem Township, New Jersey. The road conditions were "dry" and there were no adverse weather conditions. At the same time and place, New Jersey State Trooper Michael Craig, was sitting in a 2003 White Ford Crown Victoria owned by the New Jersey Department of Treasury which was parked in the center median of Interstate 78 at or near mile marker 11.1, facing east to monitor traffic. Unbeknownst to Norton, the left rear tandem wheels of the J.B. Hunt trailer separated from the axle and traveled across the westbound lanes of I 78 to the center median.

The wheels impacted the driver side hood, windshield and roof of the Craig vehicle. The tandem wheels continued to travel across the eastbound lanes of travel, over the eastbound embankment eventually coming to rest in the creek in the woods.

The trailer involved in this accident was a 1999 Lufkin dry van trailer. It was forty eight (48) feet long and had two axles. The rear trailer axle was manufactured by Meritor Automotive. The left dual wheel and tire assembly separated from the left rear axle of the trailer. The left rear outer wheel bearing assembly was never recovered after the September 16, 2005 accident. On March 11, 2003, the left rear trailer hub assembly was replaced by Austin Fleet at the request of J.B. Hunt.

From June 23, 2005 to July 4, 2005, JB Hunt performed maintenance and service with regard to the trailer at JB Hunt's East Brunswick, New Jersey facility which included work on the

trailer floor, dolly legs, cross members, electrical wiring, door hinges and both brakes on the rear axle.

On July 12, 2005, defendant, David DePue, owner and president of Lehigh Valley Fleet Maintenance, removed and replaced the trailer wheel hubcaps.

4. **PLAINTIFFS' CONTESTED FACTS** (State separately for each plaintiff. Proofs shall be limited at trial to the matters set forth below. Failure to set forth any matter shall be deemed a waiver thereof).

A.    **Plaintiffs intend to prove the following contested facts with regard to liability:**

1.    On September 16, 2005, while performing his duties as a Trooper with the New Jersey State Police, plaintiff Michael Craig was seated in the driver's seat of a New Jersey State Police patrol vehicle that was parked in the center grass median, facing east, near mile post 11.1 on Interstate 78, Bethlehem Township, Hunterdon County, N.J.

2.    At approximately 2:00 p.m., while proceeding westbound near mile post 11.1 on Interstate 78, the left rear tandem tire and wheel assembly from the trailer of a defendant JB Hunt tractor trailer separated from its axle.

3.    The tire and wheel assembly weighed approximately 400 lbs.

4.    The tractor trailer was proceeding at approximately 60 mph when the separation occurred.

5.    The tandem tire and wheel assembly crashed into the left hood, windshield and roof of Trooper Craig's vehicle.

6.    The driver of the tractor trailer at the time of the separation was defendant David

T. Norton.

7. Mr. Norton was not aware that the separation had occurred to his vehicle until notified by another truck driver via his CB radio.

8. After being notified, Mr. Norton stopped his vehicle at a rest area near mile post 8.

9. After stopping, Mr. Norton telephoned his dispatcher who told him to "hang tight", and that a JB Hunt attorney was "on the way."

10. Mr. Norton was then transported by the State Police to New Jersey State Police barracks in Perryville, New Jersey.

11. Mr. Norton had 3 to 4 telephone conversations with a JB Hunt attorney while at the Perryville barracks.

12. The attorney, John Dumont, Esq., told Mr. Norton during at least one of the telephone conversations not to talk to the police.

13. Mr. Norton told the investigating police officers that he had been instructed by a JB Hunt attorney not to give a statement.

14. Mr. Norton gave a statement to the State Police before Mr. Dumont arrived.

15. JB Hunt never asked Mr. Norton to provide a statement or complete an accident report regarding the incident.

16. Mr. Norton does not have a recollection of conducting a pre trip inspection of the trailer on September 16, 2005.

17. There is no written documentation or proof that Mr. Norton conducted a "mid trip" inspection in Carlstadt, New Jersey on September 16, 2005.

18.    JB Hunt did not have a "mid trip" vehicle inspection requirement.

19.    Mr. Norton did not recall anything unusual with respect to the operation of the vehicle on September 16, 2005, until being notified of the wheel separation.

20.    Mr. Norton had no recollection of participating in the preparation of interrogatory answers that were submitted on his behalf in this case.

21.    Trooper John Knerr led the "Commercial Vehicle Crash Inspection" investigation of the accident for the New Jersey State Police.

22.    During the investigation, Trooper Knerr identified visibly damaged threads on the left fifth axle, and further found the left fifth axle "permeated with grease."

23.    Trooper Knerr also found visible signs of tool markings on the axle bearing jam nut in "both directions" to the extent that he was unable to fit a socket on the jam nut due to the "ears" on the nut.   Trooper Knerr also found three (3) missing set screws on the fifth right inner wheel assembly.

24.    The axle bearing jam nut is an integral part of the locking mechanism, which secures the tandem to the axle.

25.    Trooper Knerr issued six (6) violations of the Federal Motor Carrier Safety Act to JB Hunt as a result of the condition of the trailer for missing and defective axle parts, loose "U bolts", left outer rear U bolt "gap", "cut" tire, missing set screws and grease "permeation."

26.    Trooper Knerr issued a summons to JB Hunt for operating an unsafe vehicle due to "improper maintenance and/or assembly."

27.    The trailer involved in this incident, identified as trailer # 083493, underwent various maintenance and inspection work at JB Hunt's East Brunswick, NJ maintenance facility

8

between June 23, 2005 and July 4, 2005.

28.    The work included brake work, removal and replacement of tires, drum removal, electrical work, body work, AA inspection, cleaning and painting a rusty wheel.  Defendant James Ross performed some of the work performed during this period.

29.    Defendant Ross, a JB Hunt maintenance mechanic, identified "chisel marks" on the NJ State Police photographs of the jam nut on the subject trailer's right rear wheel assembly. Mr. Ross did not see "set screws" in the NJ State Police photographs.

30.    Mr. Ross would have been "alarmed" if he had made such observations while performing his work because they revealed that the safety and integrity of the nut had been altered, which could result in a wheel separation.

31.    Carl Desens has been JB Hunt's "maintenance trainer" since 1997.

32.    Mr. Desens develops "service bulletins", videos, works with outside maintenance vendors and makes sure JB Hunt technicians receive training.

33.    Mr. Desens does not provide training for technicians not employed by JB Hunt.

34.    JB Hunt Maintenance personnel do not remove the hubcap to inspect the inner wheel bearing assembly when it performs the required FHWA "AA" inspections biannually.

35.    JB Hunt's policy is to remove the hubcap to perform an inspection of the inner wheel bearing assembly every five (5) years.

36.    There is no written JB Hunt procedure/policy setting forth the time interval for the inner wheel bearing assembly inspection.

37.    Other than providing "AA" inspection reports to a JB Hunt "Director" on or about September 16, 2005, in response to a request by the New Jersey State Police, Mr. Desens had no

involvement in any subject accident investigation by JB Hunt.

38.    Mr. Desens concluded based on his review of the NJ State Police accident photographs that the right fifth wheel seal had leaked.

39.    There was a "hub fire" at the subject right rear hub inner wheel assembly on June 16, 2000.

40.    On March 11, 2003, Austin Fleet Maintenance replaced the right and left rear inner-wheel bearings.

41.    This work involved the removal and replacement of the inner assembly hardware, including the jam and adjusting nuts.

42.    The work was required because the left rear bearing was "bad" and had "burnt up" and had been changed before.

43.    Austin Fleet Maintenance was the last entity to perform maintenance work in the inner wheel assembly area before September 16, 2005.

44.    Lehigh Valley Fleet Maintenance performed the biannual "AA" inspection on January 5, 2005.

45.    JB Hunt performed an "AA" inspection on July 2, 2005.

46.    The subject trailer had been in a "wreck" on or about June 21, 2005.

47.    On July 13, 2005, nine (9) days after the trailer left the JB Hunt East Brunswick repair facility, where it had been for twelve (12) days undergoing maintenance after the June 21, 2005 "wreck", Lehigh Valley Fleet Maintenance performed repairs to the subject trailer, after yet another "wreck".

10

48.   Included in Lehigh Valley Fleet Maintenance's repair work on July 13, 2005 was replacement of all four (4) hubcaps and filling the hubcaps with "lube."

49.   Lehigh Valley Fleet Maintenance did not wipe away any grease after removing the hubcaps and did not inspect the inner assembly hardware, including the jam nut.

50.   JB Hunt did not provide any literature or training videos relating to maintenance procedures to outside vendors.

51.   On or about February 25, 2003, a "campaign" consisting of a "1255 C" inspection, was initiated to inspect wheel bearings for all 1998 and 1999 Model Lufkin Trailers "ASAP."

52.   Effective September 22, 2003, J.B. Hunt issued a service bulletin for the performance of a "1252 bearing inspection" for its trailers.

53.   There is no documentation of JB Hunt's 1252 "Bearing Inspection" being performed on the subject trailer.

54.   J.B. Hunt did not look for, or provide the State Police with, either their service bulletin relating to the "bearing inspections", i.e. the 1252 and/or 1255C bulletins, or any documentation indicating whether the subject trailer had undergone any such inspections.

55.   Mr. Desens, the JB Hunt "Maintenance Trainer" had never seen the written "1255 C" wheel bearing inspection procedure before the accident.

56.   JB Hunt did not perform any investigation to determine the cause of the wheel separation on September 16, 2005.

57.   JB Hunt did not inspect the inner wheel assembly area of any of the four (4) trailer wheels during the twelve (12) days it was at the JB Hunt East Brunswick maintenance facility in June and July 2005.

11

58.     It takes approximately 2 minutes to remove a trailer hubcap and 15 20 seconds to wipe away grease to inspect the inner wheel assembly area.

59.     JB Hunt failed to preserve the axle, bearing and other portions of the left rear wheel that would have provided evidence of why the wheel separation occurred.

60.     JB Hunt does not inspect the maintenance work performed by outside vendors.

61.     In 2002 or 2003, JB Hunt eliminated thirteen (13) maintenance trainers because of "cost."

62.     Mr. Desens identified two (2) "chisel marks" on the State Police photographs of the right rear jam nut.

63.     Mr. Desens was not told that a tandem set of wheels had separated from a JB Hunt axle and caused injury until he was preparing for his deposition in November 2007.

64.     Mr. Desens would have immediately made sure a nut in the condition of the damaged nut on the right fifth inner wheel assembly would have been replaced, and he would have made sure his technicians were trained properly and he would have reviewed the maintenance procedures.

65.     The subject axle and wheel bearing on the subject trailer was manufactured by Meritor. The Meritor maintenance manual contains a warning that removing or installing spindle nuts, including jam nuts, with a hammer and chisel or similar instrument can result in "loss of wheel end components, serious personal injury, and damage to components . . ."

66.     The Meritor manual also contains a warning regarding the proper procedure for wheel bearing adjustment which indicates that a wheel bearing "adjustment that is too tight can affect wheel and bearing performance, loss of wheel and components, serious personal injury and

12

damage to components."

67.    The Meritor manual recommends that for "standard duty on highway service" the wheel end and grease "should be changed every 100,000 miles or twelve (12) months, whichever comes first."

68.    For "heavy duty service", the wheel end and grease should be changed every 30,000 miles or six (6) months, whichever comes first.

69.    JB Hunt and/or Austin Fleet Maintenance failed to comply with all of the above referenced Meritor recommendations and warnings.

70.    JB Hunt's inspection and service of its trailer axle retention hardware did not comply with those specified in the Meritor service literature.

71.    JB Hunt violated its own, Meritor's and the DOT's inspection criteria by failing to remove the outer bearings to inspect the hub grease levels in June and July 2005, and on other prior occasions.

72.    Defendant Austin Fleet Maintenance, an outside maintenance vendor, was the last entity that had control over the maintenance, repair and replacement of the left wheel bearing assembly hardware, namely, on March 11, 2003, as well as the right rear wheel assembly area. Previously, the left wheel assembly area had been "burnt up" and a fire had occurred in the right rear wheel assembly area.

73.    On July 12, 2005, Lehigh Valley Fleet Maintenance replaced four (4) plastic style hubcaps with aluminum style hubcaps.

74.    Removal of the hubcaps would have exposed the axle spindle and wheel end attaching hardware, which exhibited visible signs of damage and would have alerted Lehigh

13

Valley Fleet Maintenance of the defective condition of the wheel assembly unit.

75.   In the event that the jam nut could not be easily seen due to grease, the grease could have been easily wiped away to reveal the condition of the chisel marks on the jam nut.

76.   Carl Desens testified that upon replacing hubcaps, he would have looked for signs of damage to the spindle and the nut threads.

77.   Austin Fleet Maintenance performed a DOT inspection on March 26, 2003.

78.   Austin Fleet Maintenance performed a DOT inspection on August 14, 2003.

79.   Austin Fleet Maintenance performed an "AA" service on February 18, 2004.

80.   Austin Fleet Maintenance performed an "AA" service on July 28, 2004.

81.   On or about March 11, 2003, an Austin Fleet Maintenance mechanic damaged the jam nut on the right and left fifth inner wheel assemblies by utilizing a hammer and chisel (or some similar tool(s)), which led to the failure of the left inner wheel assembly hardware and the left tandem wheel separation.

82.   On or about March 11, 2003, an Austin Fleet Maintenance mechanic failed to utilize set screws on the right and left fifth inner wheel assembly areas, which led to the failure of the left inner wheel assembly hardware and the left tandem wheel separation.

83.   The wheels on the left side of the axle number 5 detached because the axle bearings failed.

84.   The axle bearings failed because they were not properly installed, inspected and/or maintained.

85.   JB Hunt's departure from the manufacturer recommended axle bearing service and inspection interval was improper and resulted in deficient bearing maintenance and the subject

14

wheel detachment.

86.     The last entity to install the axle bearings and their retention hardware on the left side of axle 5 did so improperly.  Based on the service invoice chronology, Austin Fleet Maintenance was the last such entity to service the axle bearings on the incident trailer in March 2003.

87.     The axle bearings on the incident trailer were over one year delinquent on their manufacturer recommended inspection and service interval when JB Hunt serviced the trailer in June/July 2005.  JB Hunt should have properly inspected and serviced the bearings at that time.

88.     Lehigh Valley Maintenance should have identified the potential for the impending left side wheel detachment during its July 13, 2005 service and should have remedied that condition or notified JB Hunt of it.

89.     By its own internal documents, JB Hunt should have known that the bearings in the incident trailer were not inspected and/or serviced by Lehigh Valley Maintenance on July 13, 2005 in accordance with even its own inadequate standards.

90.     JB Hunt failed to provide adequate support and technical information to, and oversight of, its outside vehicle service vendors.  JB Hunt also failed to properly train and/or inform its own employees about its own inspection and service procedures related to proper axle bearing maintenance.

91.     JB Hunt carelessly, defectively and negligently serviced, inspected and maintained the incident trailer both before and after the September 16, 2005 incident.

15

**B.     Plaintiff intends to prove the following contested facts with regard to damages: (This must include each item of damages, the amount of each item, the factual basis for each item and, if punitive damages are claimed, the facts upon which plaintiff will rely to establish punitive damages).**

## PHYSICAL INJURY DAMAGES

### PLAINTIFF MICHAEL S. CRAIG

As a direct result of the impact from the trailer tandem tire assembly striking the parked vehicle in which plaintiff was seated, and portions of the interior of the car in turn striking plaintiff's head and face, plaintiff suffered the following injuries/damages, for which an award of pain and suffering, disability and loss of enjoyment of life will be sought.

1.     Retinal tear requiring barrier laser photo coagulation procedure performed on November 22, 2005. The factual basis for this item of damages will be presented via testimony by plaintiff; medical records and testimony of Daniel Kohansby, O.D.

2.     Partial tear of the subscapular tendon, partial tear of the articular side supraspinatus tendon, and Bankart tear of the anterior inferior labrum, requiring arthroscopic surgery performed on February 14, 2006. The factual basis for this item of damages will be presented via testimony by plaintiff; medical records and testimony of Andrew Levy, M.D.

3.     Traumatic brain injury resulting in permanent damage to the left frontal and parietal lobes, Adjustment Disorder with mixed emotional features; and Post Traumatic Stress Disorder. The factual basis supporting this damages claim is as follows:

a.     The stopped vehicle, where plaintiff was positioned in the driver's seat, was struck in the front by a tandem tire assembly weighing approximately 400 pounds traveling at a speed of approximately 60 mph.

16

b.    The roof and windshield collapsed into the passenger compartment with portions of the vehicle's interior striking plaintiff in the head and face, resulting in a 4 cm. hematoma on his left frontal parietal scalp and a 3 mm full thickness laceration to his left eye, and additional abrasions;

c.    Trooper Craig recalled seeing an object coming toward his vehicle and attempting to move to his right, with his next recollection being seated upright in the driver's seat.

d.    The first Trooper who arrived at the scene, Geoffrey Clark, later observed the imprint of the video camera, which had been located in the vehicle=s interior, on the plaintiff's forehead.

e.    Trooper Clark described plaintiff as "lethargic", disoriented and unable to orient himself to time and place at the accident scene.

f.    Trooper Craig was transported from the accident scene to Morristown Memorial Hospital Emergency room via helicopter.

g.    Major Heidi Scripture, at the Morristown Memorial Hospital Emergency room, observed a large "goose egg" on the left side of plaintiff's forehead. She had never "seen anything like it" before. Major Scripture also stated that when she saw plaintiff in the Morristown Memorial Hospital Emergency room, he was unresponsive, dazed and "out of it."

h.    The day following the accident, Jeannette Young observed plaintiff with a large bump on the left side of his forehead, and observed plaintiff crying.

i.    Plaintiff completed an accident report two (2) days after the accident, stating he "blacked out" at the time of the accident.

17

j.      On September 21, 2005, five (5) days after the accident, plaintiff complained to the N.J. State Police Medical Services Unit that he had difficulty concentrating and maintaining his train of thought.

k.      Plaintiff, when being evaluated by neurologist Eric Englestein on September 23, 2005, one (1) week after the accident, stated he had been "very briefly unconscious or dazed" at the time of the accident.  Plaintiff complained to Dr. Englestein of "crying", losing his train of thought, lightheadedness/off balance, irritability and a "tight feeling over the left side of his head."  Dr. Englestein diagnosed plaintiff with post concussion syndrome and post traumatic stress disorder.

l.      On September 26, 2005, plaintiff told orthopedist Dr. Segal that he had trouble "collecting his thoughts" and had the "sensation of wearing a hat."

m.      Defendant's neuropsychological expert, David Masur, MD, testified that numerous accounts of the aftermath of the accident are consistent with lost or altered consciousness.

n.      On September 27, 2005, plaintiff complained to his family doctor, C. Antonia Mattei, M.D., that he had "memory loss" and "constant head pressure."  Dr. Mattei diagnosed plaintiff as having a concussion, Post Traumatic Stress Disorder and emotional lability.

o.      In mid October 2005, plaintiff attempted to return to work on a limited basis but was told to leave by a State Police doctor after an emotional breakdown.  (He was "crying at work.")

p.      On December 3, 2005, plaintiff was seen in the emergency room at St.

18

Luke's Hospital in Bethlehem because of severe headaches.

        q.     In December 2005, plaintiff's treating psychologist, Denise Novaky, Ph.D., after performing a neuropsychological assessment, concluded plaintiff had sustained a traumatic brain injury with residual deficits relating to frontal lobe syndrome; mild moderate executive dysfunction; adjustment disorder with mixed emotional features and post traumatic stress disorder.

        r.     Dr. Novaky also concluded that plaintiff's symptoms and complaints, namely poor impulse control, personality changes, disorganization, memory problems, slow response time, frustration, crying easily, losing train of thought in conversation and word finding difficulty, corresponded with the functions of the lateral convexities; the baso orbital region of the frontal lobe; the functions of the left parietal lobe; and with the areas of plaintiff's contusions.

        s.     Dr. Novaky's conclusions regarding the frontal lobe damage have been affirmed by Jeffrey A. Brown, M.D., J.D., MPH; James B. Gillock, Ed.D.; David Mahalick, Ph.D.; John Greenberg, M.D. and Kenneth Freundlich, Ph.D. subsequent to treatment and/or evaluation of plaintiff as set forth in their respective reports.

        t.     On June 5, 2006 and October 30, 2006, EEG studies were performed and found to be abnormal.

        u.     On June 28, 2006, a QEEG study was performed and found to be abnormal.

        v.     On September 16, 2005, a CAT scan of the head revealed "mild left scalp swelling."

        w.     Dr. Mattei has concluded plaintiff has suffered permanent injuries,

19

including difficulty with impulse control, short term memory, retrieveabilty of information and ideas and dysfunctional personality changes.

   x. Prior to the accident, plaintiff had missed a total of two (2) days from work due to illness during thirteen (13) years as a New Jersey State Trooper.

   y. Examining neurologist, John P. Greenberg, MD, has concluded plaintiff's traumatic brain injury has resulted in permanent cognitive neurological impairment, post traumatic stress disorder with significant personality changes; post traumatic depression and post traumatic headache disorder with TMJ components resulting from the September 16, 2005 motor vehicle accident.

   z. Examining neuropsychologist David M. Mahalick, Ph.D. has concluded plaintiff has suffered permanent "very significant cognitive neurological dysfunctions", as a result of post concussion disorder and frontal lobe syndrome, together with psycho emotional injuries.

   aa. On June 19, 2007, neuropsychologist Kenneth Freundlich, Ph.D., declared plaintiff "permanently and totally disabled from the performance of his job as a N.J. State Trooper."

   bb. Examining neuropsychiatrist Jeffrey A. Brown, M.D. has concluded plaintiff is totally neuropsychiatrically  disabled as a result of the traumatic brain injury, cognitive disorder, personality changes, post traumatic stress disorder and depression.

   cc. Testimony from lay witnesses (See 6B, below), will describe the changes in plaintiff Michael S. Craig's personality subsequent to the motor vehicle accident.

**PLAINTIFF BILLIE R. CRAIG**

As a direct result from the accident and resulting injuries to plaintiff Michael S. Craig, plaintiff Billie R. Craig suffered the following injuries/damages, for which an award for pain and suffering and loss of enjoyment of life will be sought:

1.      Depression, stress/anxiety and high blood pressure.  The factual basis for this claim will be presented through the testimony of  Dr. C. Antonia Mattei, plaintiff Billie R. Craig's general practitioner before and after the accident; Denise Novaky, who has provided plaintiffs with family counseling after the accident; testimony of Billie R. and Michael S. Craig; and testimony of lay witnesses (See 6B, below), will describe the changes to plaintiff Billie R. Craig's life resulting from the accident/injuries to her husband.

2.      Prescription of an anti depressant by Dr. Mattei.

3.      Loss of consortium.  The factual basis for this claim will be presented through the testimony of plaintiffs and through the testimony of Dr. Mattei, Dr. Novaky and lay witnesses (See 6B, below).

**PUNITIVE DAMAGES** —  *Motion for Reconsideration is Pending; appeal will be filed; JB Hunt therefore reserves right to challenge following facts*

Plaintiffs will rely upon the following facts to establish punitive damages:

1.      Following the accident, on September 16, 2005, the New Jersey State Police inspected the JB Hunt trailer.

2.      In addition to the damage and irregularities with respect to the left rear axle vicinity, the State Police found that on the opposite, "fifth right" side of the axle the "jam nut showed visible signs of tool markings from removal and installation of jam nut.  (Tool markings both directions)."

3.    The damage to the jam nut was so severe that the State Police were unable to fit a socket on the nut.

4.    In addition, there were three (3) missing set screws, which are designed to secure the inner bearing hardware, in the wheel assembly area on the right fifth axle wheel assembly.

5.    As a result of these conditions, defendant JB Hunt was cited for numerous code violations of the Federal Motor Carrier Safety Act and was issued a summons for operating an unsafe vehicle due to "improper maintenance and/or assembly."

6.    State Police photographs of the right fifth wheel assembly area depicted obvious and visible markings most likely resulting from the use of a hammer and chisel.  The wheel bearing manufacturer, Meritor, maintenance manual, contains an explicit warning that removing or installing spindle nuts, including jam nuts with a hammer and chisel or similar instrument can result in "loss of wheel end components, serious personal injury, and damage to components . . . ."

7.    JB Hunt's Maintenance Training Manager, Carl Desens, testified that the Meritor manual directives "mirror JB Hunt's procedure."

8.    Defendant JB Hunt's Maintenance Technician, James J. Ross, Jr. testified that he would be "concerned" and "alarmed" had he observed the conditions which he identified as "chisel marks" on the State Police photographs of the jam nut in the right fifth wheel assembly area.

9.    Carl Desens, the JB Hunt Transport, Inc. Maintenance Training Manager, testified that he was not informed of the circumstances of the September 16, 2005 wheel separation until he was preparing for his deposition which occurred in November 2007.

22

10.     Mr. Desens testified that had he been informed of the wheel separation, he would have taken steps to make sure the JB Hunt Maintenance Procedures and Training Procedures were correct and that he would "ensure that that nut was changed."

11.     JB Hunt does not provide maintenance procedure bulletins or video training procedures to its outside maintenance vendors.

12.     In 2002 or 2003, JB Hunt eliminated thirteen (13) maintenance technician training positions because of "cost."

13.     The two (2) JB Hunt service bulletins that address inspection of the locking mechanism hardware in the wheel assembly area that failed on September 16, 2005 were not provided to outside maintenance vendors, including defendant Austin Fleet.

14.     Following the accident on September 16, 2005, Mr. Desens was not asked to conduct a search for the 1252 or 1255C inspection reports relating to the inspection of the wheel assembly area hardware for the trailer involved in the accident.

15.     Other than providing "AA" inspection reports to a JB Hunt Director on or about September 16, 2005, Mr. Desens had no involvement in any accident investigation by JB Hunt.

16.     JB Hunt has continued to use the trailer involved in the accident since September 16, 2005, through the present.

17.     Notwithstanding the maintenance history of the left and right fifth axle wheel assembly area, notwithstanding the State Police investigation culminating in the issuance of multiple violations and summons, notwithstanding the accident with resulting injuries to Sgt. Craig, notwithstanding the graphic warnings in their and the manufacturer's maintenance manuals, and notwithstanding sworn testimony from their own employees and even their own

engineering expert retained by them in this case as to the "alarming" and "surprising" conditions depicted in the State Police photographs, namely the severe damage to the locking nut, defendant JB Hunt deliberately chose not to remedy the dangerous condition that injured Sgt. Craig, but rather deliberately chose to risk yet another wheel detachment for years following the accident, continuing through the present.

18.     Defendant JB Hunt's liability expert in this case, Bruce Ketchum, testified that he was "surprised" and "concerned" when he observed that the damaged fifth right adjusting nut had not, two and a half (2 ½ ) years after the accident, been remedied by JB Hunt.

19.     JB Hunt never asked the driver of the tractor trailer at the time of the accident, David T. Norton, for a statement concerning the accident or to complete any report about the accident.

20.     When Mr. Norton asked his supervisor the Monday after the accident why the wheels had separated from the axle, he was told "Don't worry about it."

21.     Mr. Norton stopped his vehicle at a rest area near mile post 8 after being notified that his vehicle was involved in the accident.

22.     After stopping, Mr. Norton telephoned his dispatcher who told him to "hang tight", and that a JB Hunt attorney was "on the way."

23.     Mr. Norton was then transported by the State Police to New Jersey State Police barracks in Perryville, New Jersey.

24.     Mr. Norton had 3 to 4 telephone conversations with a JB Hunt attorney while at the Perryville barracks.

25.     The attorney, John Dumont, Esq., told Mr. Norton during at least one of the

24

telephone conversations not to talk to the police.

26.     Mr. Norton told the investigating police officers that he had been instructed by a
JB Hunt attorney not to give a statement.

27.     JB Hunt did not perform any investigation to determine the cause of the wheel
separation on September 16, 2005.

28.     JB Hunt failed to preserve the axle, bearing and other portions of the left rear
wheel that could have provided evidence of why the wheel separation occurred.

## ECONOMIC DAMAGES

Plaintiff's economic damages are as follows:

1.     Worker's compensation lien:

The present worker's compensation lien relating to reimbursement to Sgt. Craig
for wage loss and medical expenses is $95,202.67. The factual basis for this element of damages
will be supplied by testimony from plaintiff Sgt. Michael Craig and a representative of the New
Jersey Department of the Treasury, Patricia Wert.

2.     The following economic losses will be established through the testimony of
plaintiffs; plaintiff Michael S. Craig's employment records and the testimony of economist, Stan
V. Smith, Ph.D.; vocational and life care expert, Richard Schuster, Ph.D.; and neuropsychiatrist,
Jeffery Brown, MD:

a.     Net wage and benefits loss to Michael S. Craig: $1,205,256.00;

b.     Loss of household/family housekeeping and home management services to
plaintiffs: $469,840.00;

25

          c.      Loss of household/family guidance services to Billie R. Craig:

$470,917.00;

          d.      Loss of household/family accompaniment services to Billie R. Craig:

$683,879.00;

          e.      Cost of future life care for Michael S. Craig: $2,886,006.00;

          f.      Loss of enjoyment of life: $2,759,757.00; (hedonic damages)

## 5. **DEFENDANT'S CONTESTED FACTS** (State separately for each defendant. See instructions above).

**A.**    **Defendants, Lehigh Valley Fleet Maintenance, Ltd., and David DePue, intend to prove the following contested facts with regard to liability:**

1.    This matter arises out of a motor vehicle accident that occurred on September 16, 2005, on Interstate 78 in Hunterdon County, New Jersey. On that date, Defendant, David T. Norton, was operating a tractor-trailer owned by his Employer, J.B. Hunt Transport, Inc., westbound on Interstate 78 when the left rear tandem wheels separated from the fifth axle of his trailer and traveled across the westbound lanes of travel and onto the center median.

2.    At the same time and place, Plaintiff, Michael S. Craig, who was acting in the course and scope of his employment with the New Jersey State Police, was seated inside his police vehicle, which was parked in the center median. Plaintiff's vehicle was struck by the left rear tandem wheels that had separated from the fifth axle of the J.B. Hunt tractor-trailer. As a result of the accident, Plaintiff alleges to have suffered various permanent injuries.

26

3.      At the time of this accident, John Knerr (hereinafter "Officer Knerr") was a Officer with the New Jersey State Police he prepared a Commercial Vehicle Investigation Report in connection with the subject accident.

4.      In the course of his investigation of the subject accident, Officer Knerr determined that the fifth rear axle of the J.B. Hunt trailer at issue was manufactured by Meritor. Officer Knerr also reviewed a Meritor Manual dealing with the subject of trailer axles prior to his investigation of the truck involved in this accident.

5.      Because the left rear tandem wheels had completely separated from the fifth axle of the trailer, Officer Knerr never found the nuts, setscrews, lock washers or bearings that would have been attached to the inner wheel assembly of the left rear tandem wheels. However, he did perform an inspection of the left rear tandem wheels, which had separated from the truck. Officer Knerr's investigation of the separated tires revealed that the inner wheel assembly had been "blown out".

6.      Officer Knerr also performed an investigation of the right rear tandem wheels that were still attached to the fifth axle. He first removed the cover, or the "hubcap", and compared the condition and assembly of the wheel to a diagram contained in the Meritor Manual. According to Officer Knerr's sworn deposition testimony and report, the wheel assembly of the right rear tandem wheels on the fifth axle revealed "visible signs of tool markings" on the jam nut from the "removal and installation" of the jam nut. Officer Knerr concluded that based upon the tool markings found on the jam nuts, the person who performed work on the right rear tandem wheel assembly did not have the proper tools.

7.      While examining the right fifth axle tandem wheels, Officer Knerr removed the

27

hubcap cover and was required to clean the area with a rag and brake cleaner. Only after the area was cleaned, was Officer Knerr able to see that three setscrew holes were missing setscrews. Additionally, the "fourth right rear U bolt" was loose and the setscrew, which prevents the "outer jam nut from backing off," was also missing.

8.    Officer Knerr found that the "left fifth axle brake pads and the right fifth axle brake drums" were permeated with grease.

9.    On March 11, 2003, Defendant Austin Fleet Maintenance replaced the left rear hub assembly of the trailer in question due to a bearing failure. At the time of said repair, Defendant Austin Fleet Maintenance also re-packed the remaining three wheel bearings with grease.

10.    Defendant Austin Fleet Maintenance was the last entity known to have repaired the left rear hub assembly of the trailer in question.

11.    Between June 23, 2005 and July 4, 2005, only two months prior to the subject accident, Defendant J.B. Hunt performed maintenance and inspected the trailer at J.B. Hunt's own East Brunswick, New Jersey facility. This maintenance and servicing included work on the trailer floor, dolly legs, cross members, electrical wiring, door hinges and both brakes on the rear axle. Additionally, Defendant, James Ross, a mechanic employed by Defendant J.B. Hunt, replaced the left rear wheel drum and brake shoes. At no time did Defendant J.B. Hunt make wheel end play measurements or wheel bearing condition inspections during the course of this two week service.

12.    On July 2, 2005, Mr. Ross replaced two brake shoes and one brake drum. According to Repair Order 8604004, the trailer brakes were worn "below specs." To perform this

task, Mr. Ross removed the lug nuts, took the tires off and removed the brake drum. After the new brake drum was installed, Mr. Ross had to "tighten and torque" the wheels.

13.     Additionally, on or about July 2, 2005, Defendant J.B. Hunt also completed the second of the Department of Transportation (DOT) mandated bi-annual inspections for 2005, otherwise referred to as an "AA Inspection." Defendant J.B. Hunt's repair order, number 8604004, dated July 2, 2005, states, "Get jack and stands from tool room, jack unit up and support unit, remove tires, remove drum, (drum frozen to hub, had to lube and beat it off), remove shoes, go to parts, locate parts and bring back to trailer, install shoes, go to parts, pick up drum and install drum on trailer/reinstall tires." Following said Inspection, Defendant J.B. Hunt indicated no negative observations related to the wheel bearings and suspension hardware.

14.     At the time of his sworn deposition, Mr. Ross confirmed that, assuming no one else touched the bolts afterward, the bolts on the tire that separated from the J.B. Hunt trailer were the same bolts that he tightened and torqued when he performed work on the brakes on July 2, 2005.

15.     Defendant, Lehigh Valley Fleet Maintenance (hereinafter "Lehigh Valley"), is an outside vendor utilized by J.B. Hunt to perform hired repairs on J.B. Hunt tractor trailers. Defendant, David DePue, is both a Mechanic as well as the President of Lehigh Valley.

16.     The involvement of Defendants, Lehigh Valley Fleet Maintenance and Mr. David DePue, was a limited field repair of the trailer in question. This field repair was performed on July 12, 2005, two (2) months and four (4) days, before the subject accident.

17.     In response to the repair order from J.B. Hunt, Mr. DePue repaired the trailer on July 12, 2005, while the trailer was located at a Nestle Water facility in Pennsylvania. When Mr.

29

DePue reached the Nestle Water facility, he found an out of service tag on the trailer indicating that there was a broken airline spring and that the marker lights weren't working.

18.     In the course of his limited field repair, Mr. DePue found the broken airline spring, "meaning the airlines would have been dangling close to the road, easy to see." He also identified the problem with the marker lights and repaired them.

19.     Additionally, Mr. DePue replaced the trailer's plastic hubcaps with aluminum ones. As Mr. DePue testified at the time of his sworn deposition, "[T]here was some trailers in this fleet that had plastic type hubcaps and we were replacing them -- replacing them with aluminum solid hubcaps.  This certainly wasn't the only trailer we did that to."

20.     Mr. DePue did not perform an inspection to determine whether there was a wheel seal leak as part of his July 12, 2005 repair because he was not asked to conduct such an inspection by J. B. Hunt. Mr. DePue also did not check the bearing end play or the nut torque of the wheel assembly because he was not told to do so by J. B. Hunt. Specifically, Mr. DePue stated that it is not the policy of J.B. Hunt for vendors to check the wheel end every time a hubcap is replaced. Furthermore, Defendant DePue testified that an individual would not even necessarily be able to see the jam nuts of a wheel assembly with the hubcap off due to the fact that grease may obstruct one's view, since the grease turns black over time.  As such, Mr. DePue testified that even if he had checked the wheel, he would likely not have been able to identify the absence of setscrews without cleaning the grease from the wheel.

**Defendant, Austin Fleet Maintenance, intends to prove the following contested facts with regard to liability:**

1.     On September 16, 2005, plaintiff Michael Craig was employed as a sergeant with

the New Jersey State Police.

2.      At approximately 1:45 p.m., September 16, 2005, Trooper Craig was sitting in the driver's seat of his New Jersey State Police cruiser that was parked in the center median strip of Route 78 in Hunterdon County, New Jersey monitoring traffic.

3.      On September 16, 2005, at approximately 1:45 p.m., defendant David Norton was operating a 2004 Freightliner truck tractor owned by his employer, JB Hunt, and traveling westbound on Interstate 78 in Hunterdon County, New Jersey.  Mr. Norton was hauling a 1999 Lufkin trailer owned by JB Hunt bearing an identification number of 83493.  As Mr. Norton passed milepost 11.1, the left rear trailer wheel assembly separated from the axle.

4.      After separating from the axle, the wheel assembly of the JB Hunt trailer traveled across the eastbound lanes of travel and into the center median striking Trooper Craig's vehicle which was parked in the center median of the roadway.  Trooper Craig claims that he was injured as a result of the left rear tandem wheels striking his vehicle.

5.      Once Norton learned that the left rear wheels of his trailer had come off he pulled over at the next rest stop approximately one mile up the highway.  There he inspected his trailer and saw that the entire left rear wheel assembly was missing.  He immediately called his dispatcher and reported the accident.  Shortly thereafter the police arrived.  Norton's dispatcher called him back and advised him not to speak to the police and that J.B Hunt's attorney was on his way to the scene.  Norton was instructed by the State Police to accompany them to the State Police Barracks where they wanted him to give a statement.  The State Police also impounded the tractor and trailer.

6.      At the Barracks Norton was in communication several times with Mr. Jon

31

Dumont, Esquire the attorney for J.B. Hunt who was coming to represent Norton. While Mr. Dumont was enroute, Norton provided a statement to the State Police. After that, Mr. Dumont arrived at the Barracks along with an investigator and J.B. Hunt's Director of Litigation. Norton spoke briefly with these gentlemen and was given a ride home by the investigator.

7.     Following the accident, Trooper John Knerr of the New Jersey State Police conducted an investigation of the accident and inspected the JB Hunt trailer. Trooper Knerr's investigation revealed that: (a) the fifth rear axle of the trailer was manufactured by Meritor; (b) the left rear wheels had completely separated from the fifth axle; (c) the jam nut and outer wheel bearings were never recovered; and (d) the left rear axle brake pads were permeated with grease. A photograph of the end of the left rear axle shows that the brake shoes, wheel seal and inner bearing cone were still attached to the fifth axle.

8.     On September 27, 2005, JB Hunt repaired the damaged trailer at its East Brunswick, New Jersey facility. When the trailer was repaired by JB Hunt subsequent to the accident the brake shoes, wheel seal and inner bearing cone were not preserved by JB Hunt and have been lost and/or destroyed. JB Hunt did retain and preserve the tandem wheel assembly which separated from the axle.

9.     Service and repair records for the trailer reflect work performed by JB Hunt as well as various outside vendors including AFM and LVFM.

10.     Two and a half years prior to the accident, on March 11, 2003, AFM replaced the left rear hub assembly of the trailer due to a bearing failure and repacked the remaining three wheel bearings with grease. AFM's invoice for this service includes notations that indicate that the wheel end play was measured during the service and found to be within specified tolerance.

32

11.     Because wheel end play was measured and recorded by AFM upon completion of the wheel bearing installation, the wheel bearings could not have been subject to a "minor over tightening."

12.     AFM properly installed the left rear wheel bearings.

13.     AFM's installation of the left rear wheel bearings is not a cause of the September 16, 2005 accident.

14.     From March 21, 2003 through September 16, 2005, the JBH trailer was operated for two and a half years, for 895 days, and a total of 110,788 miles, traveling an average of 124 miles per day.

15.     Between the March 12, 2003 and June 23, 2005, JB Hunt performed no maintenance or service on the trailer with regard to the left rear hub or bearings. During this two year period the trailer was operated by JB Hunt for more than 800 days and was hauled over 105,000 miles.

16.     Industry standards, and the manufacturer's recommendations, required that the wheel end grease "should be changed every 100,000 miles or twelve (12) months, which ever comes first."

17.     When the trailer is subject to heavy duty service the wheel end grease should be changed every 30,000 miles or six (6) months, which ever comes first.

18.     JB Hunt failed to comply with these standards with regard to the subject trailer.

19.     The Department of Transportation inspection, also referred to by JB Hunt as an "AA Inspection" is a comprehensive examination of the trailer. This inspection includes the trailers wheel assemblies. These inspections revealed no negative observations related to the

33

wheel bearings and suspension hardware.

20.    On January 5, 2005, LVFM, completed a bi annual AA inspection mandated inspection of the trailer on behalf of JB Hunt.

21.    On July 2, 2005, JB Hunt completed an AA inspection of the trailer.

22.    Approximately two months prior to the accident, from June 23, 2005 to July 4, 2005, JB Hunt performed maintenance and service with regard to the trailer at JB Hunt's East Brunswick, New Jersey facility which included work on the trailer floor, dolly legs, cross members, electrical wiring, door hinges and both brakes on the rear axle. Work performed by JB Hunt included replacement of the left rear wheel drum and brake shoes on July 2, 2005. At that time, JB Hunt also completed the second of the DOT mandated bi annual inspections for 2005. JB Hunt's repair order, number 8604004 dated July 2, 2005, states: "Get jack and stands from tool room, jack unit up and support unit, remove tires, remove drum (drum frozen to hub, had to lube and beat it off), remove shoes, go to parts, locate parts and bring back to trailer, install shoes, go to parts, pick up drum and install drum on trailer/reinstall tires."

23.    James Ross, a mechanic employed by JB Hunt performed the work on the trailer on July 2, 2005 involving the replacement of the brake drum and shoes at the left rear wheel position. JB Hunt did not make wheel endplay measurements or wheel bearing condition inspections during this two week service.

24.    Nine days later, on July 13, 2005, LVFM provided road side service to JB Hunt with regard to this trailer. Between July 4, 2005 and July 13, 2005, the trailer traveled approximately 120 miles.

25.    On July 13, 2005, LVFM addressed an "out of service tag," performed wiring

34

repairs, replaced lamps and "all (four) plastic end type hubcaps . . . with solid aluminum type hubcaps." During this service LFVM filled the new hubcaps with grease, cleaned out the wheels and replaced the support springs for the break lines. The July 13, 2005 service by LFVM was performed by defendant David DePue, who used brake cleaner to clean off the grease on the wheel rim. Between July 13, 2005 and September 16, 2005, the trailer traveled approximately 5,262 miles. Mr. DePue suggested that JB Hunt systematically replaced plastic hubcaps with aluminum ones and that this service was part of that procedure.

26.     Carl Desens, Maintenance Training Manager for JB Hunt, testified that JB Hunt has various periodic inspections and maintenance procedures for their trailers. Mr. Desens stated that an annual inspection called an "AA Service" is performed but this inspection does not include examination of the wheel bearings. He further stated that a service campaign identified as the "1255 C" service specifically involved Lufkin Trailers, including the trailer at issue in this case, which did include adjusting and inspecting the wheel bearings. According to Mr. Desens the "1255 C" service was performed on a five year cycle. Mr. Desens related that JB Hunt instituted a wheel seal recall campaign that affected all Lufkin trailers in its fleet. He indicated that he did not know why the hubcaps were changed on the incident trailer by LVFM on July 13, 2005.

27.     James Ross testified that the purpose of the "C Service" (1255 C) is to inspect the outer wheel bearings and grease to ensure that neither is failing. Ross stated that the only reason why technician would remove the trailer wheel hubcaps would be to perform a "C Service" inspection or to repair a wheel seal or hubcap gasket failure. Ross testified that he believed the LVFM service was a "C Service." He did not know why all four hubcaps would be changed.

35

28.     The USDOT, FHA, Federal Motor Carrier Safety Regulations require that: "Every motor carrier shall systematically inspect, repair and maintain, or cause to be systematically inspected, repaired, and maintained, all motor vehicles subject to its control." On September 16, 2005, the trailer was in the sole possession and control of its motor carrier, JB Hunt. JB Hunt had a duty to ensure that the trailer was maintained in a condition that was reasonably safe for operation on public roadways.

29.     JB Hunt's practices regarding inspection and maintenance of the wheel bearings of its trailer fleet were inadequate. JB Hunt performs preventative maintenance and inspections of the wheel equipment, including bearings, lubrication and retention hardware, on five year intervals. Industry standards recommend inspections every 100,000 miles or annually, which ever is less. No manufacturer recommends maintenance cycles for truck wheel bearings on a five year cycle. Physical evidence as reported by the NJ State Police, and observed during inspections of the trailer and wheel assembly, support the argument that JB Hunt's maintenance practices with regard to the trailer wheel equipment does not meet industry standards.

30.     There is no evidence of record to determine the specific cause of the wheel separation on September 16, 2005.

31.     There is no evidence of record which indicates that, or from which an inference may be drawn, that AFM was negligent when it replaced the left rear wheel bearings of the trailer on March 11, 2003.

32.     There is no evidence of record to make a correlation between the work performed by AFM two and half years prior to the accident after the trailer had logged over 110,000 miles as having any causal relationship to the wheel separation.

36

33.     Multiple theories have been advanced as to the cause of the wheel separation on September 16, 2005 including wheel bearing failure, wheel seal failure, failure of the jam nut due to fatigue or defect, an outer wheel bearing failure due to contamination or improper quantity of hub cap grease, or impact damage from roadway debris which could shear off the hubcap and damage the wheel retention hardware.  Each of these possible scenarios is all equally feasible based on the evidence of record.

34.     The evidence available in this matter does not support a determination of what specifically caused the wheel assembly to separate from its axle on 9/16/05 within a reasonable degree of engineering certainty.

35.     Wheel bearing failure is a possible cause of the subject accident; however, there is no evidence to definitively determine that a wheel bearing failure did indeed occur.

36.     The presence of grease on the brake drum and brake pads could have resulted from a wheel seal failure, but could also have resulted fro the wheel separating and breaking the seal during the event.

37.     In failing to preserve the wheel seal and inner bearing cone that remained on the axle spindle after the event, J. B. Hunt effectively prevented any definitive determination of whether the inner wheel bearing had failed.  Wheel bearing failures that result in wheel separating from axles spindles typically exhibit obvious signs of failure such as broken, burned and/or deformed parts.  Police photographs of the inner wheel bearing do not show such obvious failure conditions and the police inspection report makes no mention of wheel bearing failure. As such, J.B. Hunt's failure to retain the inner wheel bearing and seal eliminates that ability to definitively determine whether a full wheel bearing failure had occurred, the remaining evidence

37

does not strongly suggest that such failure occurred.

38.    Other possible causes for wheel separation include catastrophic failure of the jam nut due to fatigue and/or latent defect; and outer wheel bearing failure resulting from contamination or improper quantity of hub cap grease; or impact damage from roadway debris, which sheared off the hub.

39.    There is no reasonable correlation between the happening of the September 16, 2005 accident and work performed by AFM on March 11, 2003.

40.    JB Hunt's continuous operation of the trailer over 2 ½ years and in excess of over 110,000 miles exceeds the manufacturers' recommended maintenance interval.

41.    If there was a slow, progressive wheel bearing failure do to a minor over tightening of the wheel end hardware as suggested by Plaintiffs, then in June and July of 2005 when JB Hunt and LVFM were working on the brake drums and replacing the hubcaps, respectively, there would have been clear and obvious evidence of the impending wheel bearing failure.

42.    If the left rear wheel bearings were experiencing a slow progressive failure between March 2003 and September 16, 2005, the failure to observe the progressive failure condition by either JB Hunt or LVFM, in June/July 2005 and July 2005, respectfully, was a breach of the standard of care.

43.    The September 16, 2005 accident and resulting injury to Mr. Craig resulted from the failure of the wheel retention hardware on the left rear wheel of the incident J.B. Hunt trailer from unknown causes that were not related to the installation of the wheel bearing performed by

Austin Fleet Maintenance roughly 2 ½ and 110,000 miles prior to the event.

44.    No reasonable correlation between the subject accident event and any work performed by Austin Fleet Maintenance has been presented.

45.    As the motor carrier that owned and operated the involved trailer, J.B. Hunt was solely responsible for its maintained condition, as promulgated by the U.S. Department of Transportation.

**Defendants, J.B. Hunt Transport, Inc.; J. Ross and David Norton, intend to prove the following contested facts with regard to liability:**

1.    J.B. Hunt maintained a comprehensive and appropriate program to periodically inspect and maintain its trailers.

2.    J.B. Hunt complied with an appropriate inspection and maintenance schedule for the trailer that was involved in this incident.

3.    J.B. Hunt properly trained its mechanics.

4.    The left rear wheel assembly on the trailer failed because of over-tightening (pre-load) of the bearing.

5.    Austin Fleet replaced the wheel bearings on the trailer on March 11, 2003, and this was the last time that the wheel bearings were replaced or adjusted.

6.    Austin fleet's repair of March 11, 2003 also represents the last time that the wheel end hardware was removed from the trailer.

7.    The left rear wheel jam nuts of the trailer were improperly removed and installed with a hammer and chisel (instead of an appropriate socket and torque wrench) on March 11, 2003.

8. Austin Fleet did not properly train its mechanics, provide appropriate tools for use by its mechanics, and/or failed to supervise its mechanics in the use of proper tools and inspection procedures.

9. Austin Fleet failed to properly monitor, supervise and train its mechanics regarding the appropriate removal, installation and adjustment of the wheel bearing assembly.

10. Austin Fleet was negligent in its inspection of the wheel bearing assembly.

11. Defendant, Austin Fleet, is responsible for plaintiffs' alleged damages, if any, because it improperly removed, installed and adjusted the left wheel bearing assembly.

12. On or about July 12, 2005, David DePue of Lehigh Valley Maintenance removed and replaced the hubcaps on the trailer. This was the last time prior to the September 16, 2005 incident that the wheel ends were exposed.

13. Lehigh Valley and David DePue are responsible for plaintiffs' alleged damages, if any, because they had the last opportunity to observe and report any defects in the wheel ends, including the obvious and improper tool markings which were present on the jam nuts.

14. Austin Fleet and Lehigh Valley Maintenance are outside vendors which held themselves out to be qualified in the field of trailer maintenance and repair.

15. There were no signs of impeding wheel separation that could have been visible to defendant, David Norton, the truck driver who was hauling the trailer at the time of the September 16, 2005 incident.

16. Defendant, David Norton, performed all required tractor-trailer inspections on the day of the incident.

40

17.     There were no signs of impeding wheel separation that could have been visible to any J.B Hunt employee or mechanic working on the subject trailer.

18.     Work performed by defendant, J. Ross, would not have revealed the condition of the inner wheel assembly.

**B.     Defendants, Lehigh Valley Fleet Maintenance, Ltd., David DePue, J.B. Hunt, J. Ross, David T. Norton and Austin Fleet Maintenance, intend to prove the following contested facts with regard to damages. (This statement must include the factual basis for each defense against Plaintiff's claims for damages.)**

1.     Plaintiff, Michael Craig, sustained no permanent brain injury. Defendants refer to the opinions contained the reports of the experts identified in No. 8C below. Plaintiff's immediate post-accident medical records indicate that he was alert and oriented at all times, with a Glascow Coma Scale of 15. Objective diagnostic studies (CT scans, MRI study of the brain, EEG studies) showed no evidence of brain injury or other abnormalities.

2.     Plaintiff, Michael Craig, has no disability restricting him from gainful employment. Defendants refer to the opinions contained the reports of the experts identified in No. 8C below, including a recent (May 2008) evaluation by Dr. Chelder, who stated that plaintiff's "neuropsychological test results did not reveal any evidence that would prevent him from performing his job as a state trooper." An eye examination on March 7, 2006 revealed his visual acuity to be 20/20.

3.     Plaintiff, Michael Craig, does not require the future care and treatment as set forth in his life care plan. Defendants refer to the opinions contained the reports of the experts identified in No. 8C below. There is no credible and/or objective evidence that plaintiff sustained a traumatic brain injury. As for his physical complaints following this incident, plaintiff last

41

treated with orthopedic surgeon, Andrew Levy, M.D., in May 2006, at which time he was found to have full range of motion in the right shoulder. Plaintiff's eyesight remains at 20/20.

4.      Defendants dispute the facts relied upon by plaintiffs' economist, Stan Smith, in arriving at his opinions. Defendants refer to the opinions contained the reports of the experts identified in No. 8C below. Defendants reserve the right to supplement this response after the deposition of Mr. Smith is completed.  Defendants also specifically dispute the calculation of "economic losses" set forth in Plaintiffs' Contested Facts on Damages, No. 4B - 2.a through f, including but not limited to Mr. Smith's attempt to calculate "hedonic damages," loss of consortium, loss of guidance, loss of accompaniment services, and future life care.

5.      Defendants dispute the bases for plaintiffs' calculation of alleged loss of services and loss of consortium (i.e., such as the amount of time Mr. Craig would or did spend on such services). Moreover, Billie Craig is not entitled to seek damages for her own alleged bodily injury (i.e., depression).

**J.B. Hunt ONLY:**

6.      Defendants dispute that the plaintiffs are entitled to punitive damages. In fact, this Honorable Court has already ~~dismissed~~ *denied* plaintiffs' *Motion to add* claim for punitive damages and, therefore, its inclusion in this Pre-Trial Order is wholly inappropriate. Plaintiff's litany of "facts" set forth in this section are inaccurate, misleading and irrelevant to the current litigation. Moreover, defendants specifically deny the allegations set forth in this entire section, including but not limited to nos. 4,5, 8-20, 22, and 24-28.

42

**6. PLAINTIFF'S WITNESSES** (Aside from those called for impeachment purposes, only those witnesses whose names and addresses are listed below will be permitted to testify at trial).

**A.      On liability, plaintiff intends to call the following witnesses who will testify in accordance with the following summaries:**

**PLAINTIFF MICHAEL S. CRAIG**

Mr. Craig will testify as to his recollection of the accident circumstances.

**TROOPER JOHN KNERR, NJ STATE POLICE**

Trooper Knerr is expected to testify as to the investigation he performed and investigation results that he obtained on behalf of the New Jersey State Police with respect to the subject accident. This testimony will include the damage observed by Trooper Knerr on the left fifth axle, as well as the damage found on the fifth right inner wheel assembly. Trooper Knerr will also testify regarding the violations and summons issued to JB Hunt as a result of the missing and defective axle components and other maintenance problems. Trooper Knerr will also testify as to what is depicted in the photographs taken by and/or on behalf of the New Jersey State Police during the accident investigation.

**TROOPER ERIC HEITMAN, NJ STATE POLICE**

Trooper Heitman will testify as to the circumstances surrounding the photographs that he took relating to the accident investigation.

**DET. SGT. JAMES KIERNAN, NJ STATE POLICE**

Det. Sgt. Kiernan will testify as to the chain of custody with respect to the separated tandem wheels.

**TROOPER GEOFFREY CLARK, NJ STATE POLICE**

Trooper Clark will testify as to observations at the accident scene and his role in the

accident investigation.

## SGT. PAUL SOFHAUSER, NJ STATE POLICE

Sgt. Sofhauser will testify as to his role during the investigation of the subject accident and to his comunication with David T. Norton.

## TROOPER C.D. HOLJES, NJ STATE POLICE

Trooper Holjes will testify as to his observations at the accident scene and to his role in the investigation of the subject accident.

## TROOPER DAN HIGHWELL, NJ STATE POLICE

Trooper Highwell will testify concerning his observations at the accident scene and his role in the accident investigation.

## DEFENDANT JAMES ROSS

Mr. Ross will testify as to the nature of the maintenance and inspection work performed on the subject trailer at the East Brunswick JB Hunt Maintenance facility between June 23, 2005 and July 4, 2005.  Mr. Ross will also testify as to what is depicted in New Jersey State Police photographs of the jam nut on the subject trailer's right rear wheel assembly.  Mr. Ross will also testify concerning JB Hunt's maintenance and inspection procedures with respect to inner wheel bearing assembly.

## CARL DESENS, JB HUNT'S "MAINTENANCE TRAINER"

Mr. Desens will testify as to what is depicted in the New Jersey State Police photographs of the right inner wheel assembly area; JB Hunt's training policies for JB Hunt employees, as well as outside maintenance vendors; JB Hunt's policy and procedure regarding maintenance and inspection of inner wheel bearing assemblies; the development of "service bulletins" and/or

44

videos for inner wheel bearing assemblies and his role in the subject accident investigation.

## DEFENDANT DAVID T. NORTON

Mr. Norton will testify as to his inspection of the subject trailer on September 16, 2005; his operation of the subject vehicle prior to, during and subsequent to the wheel separation and his interactions with JB Hunt employees and/or representatives immediately following the accident and thereafter.

## R. SCOTT KING, P.E.

Mr. King will testify in accordance with his report and deposition testimony rendered in this case.

Plaintiffs reserve the right to supplement this witness list in accordance with the Court scheduling Order. Additionally, they reserve the right to call any witness identified by the defendants at time of trial. Plaintiffs also reserve the right to call rebuttal witnesses.

## BRUCE KETCHAM

Mr. Ketcham will testify as to his "concern" and "surprise" as to his observation of the damaged right wheel assembly area and the fact that J.B. Hunt had not repaired the damage in the 2 ½ years since the accident.

**B.      On damages plaintiff intends to call the following witnesses who will testify in accordance with the following summaries:**

## MICHAEL S. CRAIG

Plaintiff Michael S. Craig will testify as to his physical, emotional and cognitive status and abilities prior to the accident. He will testify as to the happening of the accident, medical

treatment and physical pain and suffering from the time of the accident through the time of trial, the emotional and cognitive symptoms and complaints from the time of the accident through the present. He will also testify concerning the affect his injuries and disabilities have had upon himself, his family, including plaintiff Billie R. Craig and their four (4) children. He will also testify as to the changes in his life since the accident.

**BILLIE R. CRAIG**

Plaintiff Billie R. Craig will testify as to her husband's personality, physical, emotional and cognitive status and abilities prior to the accident, and their family life prior to the accident. She will also testify about her observations of her husband's injuries between the time of the accident through the present. These injuries include physical, emotional and cognitive. She will also testify regarding the changes to her husband's personality subsequent to the accident and the affect of these changes on her husband, herself and their family.

**JEROME B. SEGAL**

Jerome B. Segal will testify as to his observations of Michael S. Craig's physical condition, personality and family relationships and emotional and cognitive status prior to the accident. He will also testify concerning Michael S. Craig's physical, emotional, cognitive status and abilities and his overall personality since the accident and the affect these changes have had on Michael S. Craig, Mr. Craig's family and other relationships.

**JEANETTE YOUNG**

Jeanette Young will testify as to the personality, physical, emotional and cognitive abilities and status of Michael S. Craig and Billie R. Craig prior to the accident. She will also testify concerning her observations of Michael S. Craig's physical, emotional and cognitive status

and family relationships following the accident. She will also testify concerning her observations of Billie R. Craig's emotional status after the accident and the changes in family relationships after the accident.

**MICHAEL PANELLA**

Michael Panella will testify as to the physical, emotional and cognitive condition, abilities and personality of Michael S. Craig before the accident. He will also testify as to any differences and/or changes in Michael S. Craig's personality, cognitive, emotional or physical status and abilities after the accident.

**TANYA L. SEGAL**

Ms. Segal will testify as to the personality, physical, emotional and cognitive abilities and status of Michael S. Craig and Billie R. Craig prior to the accident. She will also testify concerning her observations, Michael S. Craig's physical, emotional and cognitive status and family relationships following the accident. She will also testify concerning her observations of Billie R. Craig's emotional status after the accident and changes in family relationships after the accident.

**LAUREN RICCARDI**

Ms. Riccardi will testify as to the personality, physical, emotional and cognitive abilities and status of Michael S. Craig and Billie R. Craig prior to the accident. She will also testify concerning her observations, Michael S. Craig's physical, emotional and cognitive status and family relationships following the accident. She will also testify concerning her observations of Billie R. Craig's emotional status after the accident and changes in family relationships after the accident.

## THEODORE R. CRAIG

Mr. Craig is Michael S. Craig's brother.  Mr. Craig will testify as to the personality, physical, emotional and cognitive abilities and status of Michael S. Craig and Billie R. Craig prior to the accident.  He will also testify concerning his observations, Michael S. Craig's physical, emotional and cognitive status and family relationships following the accident.  He will also testify concerning his observations of Billie R. Craig's emotional status after the accident and changes in family relationships after the accident.

## JOHN TISON

Mr. Tison will testify as to the personality, physical, emotional and cognitive abilities and status of Michael S. Craig and Billie R. Craig prior to the accident.  He will also testify concerning his observations, Michael S. Craig's physical, emotional and cognitive status and family relationships following the accident.  He will also testify concerning his observations of Billie R. Craig's emotional status after the accident and changes in family relationships after the accident.

## MAJOR HEIDI SCRIPTURE, NJ STATE POLICE

Major Heidi Scripture will testify concerning her observations of Michael S. Craig at Morristown Memorial Hospital's emergency room on the day of the accident.

## TROOPER GEOFFREY CLARK, NJ STATE POLICE

Trooper Geoffrey Clark will testify as to his observations and impressions of Michael S. Craig's physical, emotional and cognitive status and abilities prior to the accident.  Trooper Geoffrey Clark will also testify as to his observations of plaintiff's physical, emotional and cognitive condition on the day of the accident.  Trooper Geoffrey Clark will also testify as to his

48

observations/impressions of Michael S. Craig's physical, emotional and cognitive abilities and status after the accident, as well as differences and/or changes in Michael S. Craig's personality after the accident.

## SGT. PAUL SOFHAUSER

Sgt. Sofhauser will testify as to his observations and impressions of Michael S. Craig's physical, emotional and cognitive status and abilities prior to the accident. Sgt. Sofhauser will also testify as to his observations of plaintiff's physical, emotional and cognitive condition on the day of the accident. Sgt. Sofhauser will also testify as to his observations/impressions of Michael S. Craig's physical, emotional and cognitive abilities and status after the accident, as well as differences and/or changes in Michael S. Craig's personality after the accident.

Sgt. Sofhauser will also testify as to overtime opportunities available for Michael S. Craig.

## TROOPER DAN HIGHWELL

Trooper Dan Highwell will also testify as to his observations and impressions of Michael S. Craig's physical, emotional and cognitive status and abilities prior to the accident. Trooper Highwell will also testify as to his observations of plaintiff's physical, emotional and cognitive condition on the day of the accident and his observations/impressions of Michael S. Craig's physical, emotional and cognitive abilities and status after the accident, as well as differences and/or changes in Michael S. Craig's personality after the accident.

## DET. SGT. JAMES KIERNAN

Det. Sgt. James Kiernan will testify as to the physical, emotional and cognitive condition and personality of Michael S. Craig before the accident. He will also testify as to any differences

49

and/or changes in Michael S. Craig's personality, cognitive, emotional and/or physical status and abilities after the accident.

## TROOPER C.D. HOLJES

Trooper Holjes will testify as to his observations and impressions of Michael S. Craig's physical, emotional and cognitive status and abilities prior to the accident. Trooper Holjes will also testify as to his observations of plaintiff's physical, emotional and cognitive condition on the day of the accident. Trooper Holjes will also testify as to his observations/impressions of Michael S. Craig's physical, emotional and cognitive abilities and status after the accident, as well as differences and/or changes in Michael S. Craig's personality after the accident.

## C. ANTONIA MATTEI, MD

Antonia Mattei, M.D. is Michael S. Craig's primary care physician. She will testify as to Michael S. Craig's physical, cognitive and emotional conditions before the accident. She will testify as to physical, cognitive and emotional injuries resulting from the injuries sustained in the accident and the impact that these injuries have had upon his family. She will also testify concerning prognosis and future medical treatment, including medication.

Dr. Mattei is also plaintiff Billie R. Craig's primary care physician. She will testify as to her physical and emotional conditions before the accident and the affect the injuries to her husband have had upon her physical and emotional condition, her treatment of those conditions, prognosis and future medical treatment.

## DANIEL KOHANSBY, O.D.

Daniel Kohansby, O.D., will testify concerning the condition of plaintiff's eyes prior to the accident; the injury to plaintiff's right eye as a result of the accident, the treatment of the eye

injury, including the barrier laser photo coagulation procedure performed on November 22, 2005 and the prognosis for the eye.

**ANDREW LEVY, M.D.**

Andrew Levy, M.D., will testify as to the right shoulder injury sustained by plaintiff in the accident that the injury was causally related to the accident and testify concerning the treatment including surgery, provided to plaintiff and the prognosis for the shoulder injury.

**DENISE NOVAKY, PH. D**

Denise Novaky, Ph.D. will testify as to plaintiff's past medical history; the traumatic brain injury; adjustment disorder and post traumatic stress disorder sustained by Michael S. Craig in the accident; that the injuries are causally related to trauma from the accident; her treatment of plaintiff; her treatment of others; the results of her neuro psychological testing and assessments of plaintiff and the prognosis. She will also testify concerning plaintiff's neurofeedback and cognitive retraining performed by James Gillock, Ph.D.

Dr. Novaky will also testify as to the psychological and emotional affect of Michael S. Craig's injuries upon plaintiff Billie R. Craig and the treatment Dr. Novaky provided to plaintiff Billie R. Craig.

**JEFFREY BROWN, M.D., JD, MPH**

Jeffrey Brown, M.D., J.D. MPH, will testify as to plaintiff's past medical history; psychiatric evaluation of Michael S. Craig, his analysis of multiple treatment and evaluation records; the results of the mental status and psychological tests, which he performed upon plaintiff and his diagnostic impressions, which include personality change secondary to traumatic brain injury, post traumatic stress disorder, relational problems, cognitive disorder secondary to

51

traumatic brain injury, traumatic brain injury, frontal lobe syndrome, major depressive episode of paranoid psychotic features and total nerve psychiatric disability.  Dr. Brown will also testify concerning plaintiff Michael S. Craig's present medication as prescribed by Dr. Jacoby.  Dr. Brown will also causally relate plaintiff's neuro psychiatric injuries to the trauma sustained in the September 15, 2005 accident and testify concerning future treatment and prognosis.

**JOHN P. GREENBERG, M.D.**

John P. Greenberg, M.D. will testify as to his neurological evaluation of Michael S. Craig conducted on December 12, 2006; his analysis of multiple treatment and evaluation records; plaintiff's residual neurological symptoms; the results of his neurological examination; his diagnostic impressions; specifically that plaintiff suffered a traumatic brain injury with significant residual cognitive and neurological impairments as a result of the motor vehicle accident, together with post traumatic stress disorder and significant personality changes, post traumatic depression, post traumatic headache disorder and TMJ components.  Dr. Greenberg will also testify as to the permanency of these conditions and the neurological, neuro psychological and psychiatric disabilities resulting from these injuries.  Dr. Greenberg will causally relate these injuries and disability to the trauma sustained in the September 16, 2005 accident and will further testify concerning future treatment and prognosis.

**DAVID M. MAHALICK, PH.D.**

David M. Mahalick, Ph.D. will testify as to his neuro psychological evaluation of Michael S. Craig; his analysis of multiple treatment and evaluation records; the results of the neuro psychological testing which he administered to plaintiff on January 30, 2007 and March 7, 2007; plaintiff's past medical history; plaintiff's present complaints; his diagnostic impressions, which

include traumatic brain injury with cognitive/neurological impairment, higher cortical dysfunction , neuro psychiatric impairment and psycho emotional changes. Dr. Mahalick will also causally relate plaintiff's neuro psychological and neuro psychiatric injuries to the trauma sustained in the September 16, 2005 accident and testify concerning future treatment and prognosis.

## RICHARD SCHUSTER, PH.D.

Richard Schuster, Ph.D. will testify as to his vocational and rehabilitation needs; examination of plaintiff conducted on November 16, 2006; his analysis of multiple treatment and evaluation records; the results of the cognitive/vocational status testing, which he administered; the results of inventories completed by plaintiff, plaintiff's wife and Michael Panella; and plaintiff's vocational potential based upon his evaluation and labor market analysis.'

Dr. Schuster will also testify as to plaintiff's medical and therapeutic needs and the cost of that treatment and service as set forth in his June 18, 2007 report.

## PATRICIA WERT, SR. CLAIMS INVESTIGATOR, NJ DEPT OF TREASURY

Patricia Wert will testify as to the outstanding lien relating to the worker's compensation matter.

Plaintiffs reserve the right to supplement this witness list in accordance with the Court scheduling Order. Additionally, they reserve the right to call any witness identified by the defendants at time of trial. Plaintiffs also reserve the right to call rebuttal witnesses.

**C.**  **Defendants Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the following witnesses for the reasons stated:**

**PLAINTIFF, MICHAEL S. CRAIG:**

Defendants, Lehigh Valley Fleet Maintenance, Ltd., and David DePue, object to the offering of any testimony based on hearsay, speculation and to which he has no personal knowledge. It is further the position of Defendants, Lehigh Valley Fleet Maintenance, Ltd., and David DePue, that Mr. Craig has failed to provide any specific proofs regarding damages and should be barred from testifying to same. *Challenges shall be made regarding expert testimony NOT factual statements by Craig*

**PLAINTIFFS; WITNESS, NEW JERSEY STATE POLICE OFFICER, JOHN KNERR**

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the offering of any testimony based on hearsay, speculation and to which he has no personal knowledge. *Trial Brief*

**PLAINTIFFS' WITNESS, NEW JERSEY STATE POLICE DET. SGT. JAMES KIERNAN**

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the offering of any testimony based on hearsay, speculation and to which he has no personal knowledge. *Stipulation likely*

**PLAINTIFFS' WITNESS, NEW JERSEY STATE POLICE OFFICER, GEOFFREY CLARK**

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the offering of any testimony based on hearsay, speculation and to which he has no personal knowledge. *Trial Brief*

**PLAINTIFFS' WITNESS, NEW JERSEY STATE POLICE SGT. PAUL SOFHAUSER**

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the

offering of any testimony based on hearsay, speculation and to which he has no personal

knowledge.                                      *Trial Brief*

**PLAINTIFFS' WITNESS, NEW JERSEY STATE POLICE OFFICER, C.D. HOLJES**

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the

offering of any testimony based on hearsay, speculation and to which he has no personal

knowledge.                                      *Trial Brief*

**PLAINTIFFS' WITNESS, NEW JERSEY STATE POLICE OFFICER, ERIC HEITMAN**

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object only to the

offering of any testimony based on hearsay, speculation and to which he has no personal

knowledge.

*Parties shall stipulate to authenticity of state police photographs*

**PLAINTIFFS' WITNESS, NEW JERSEY STATE POLICE OFFICER, DAN HIGHWELL**

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the

offering of any testimony based on hearsay, speculation and to which he has no personal

knowledge.                                      *Trial Brief*

**PLAINTIFFS' WITNESS, JAMES ROSS**

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the

offering of any testimony based on hearsay, speculation and to which he has no personal

knowledge.                                      *at trial*

55

**PLAINTIFFS' WITNESS, CARL DESENS**

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the offering of any testimony based on hearsay, speculation and to which he has no personal knowledge. *at Trial*

**PLAINTIFFS' WITNESS, DAVID T. NORTON**

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the offering of any testimony based on hearsay, speculation and to which he has no personal knowledge. *at Trial*

**PLAINTIFFS' LIABILITY EXPERT WITNESS, R. SCOTT KING** *A Limine*

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the offering of any testimony based on hearsay, speculation and to which he has no personal knowledge. Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the introduction of testimony/opinion of Plaintiff's expert, R. Scott King, with respect to his determination of liability/negligence as to Defendants, Lehigh Valley Fleet Maintenance and David DePue. Such a determination is conclusory and, at best, speculative and must be barred. Mr. King's opinions fail to comply with the requirements of Rule 702. Specifically, his opinions are neither based on facts or data. Mr. King's opinions are not "the product of reliable principles and methods," as required by established case law regarding net opinion and pursuant to Rule 702. In the absence of physical evidence and without stating an established professional standard of conduct upon which to rely, Mr. King's opinions are bare conclusions lacking a factual foundation. As such, all of the opinions expressed by Mr. King, regarding the potential liability of Defendants, Lehigh Valley Fleet Maintenance and DePue, are speculative conjecture which

56

must be barred.

**PLAINTIFF, BILLIE R. CRAIG**

Defendants, Lehigh Valley Fleet Maintenance, Ltd., and David DePue, object to the

offering of any testimony based on hearsay, speculation and to which she has no personal

knowledge. It is further the position of Defendants, Lehigh Valley Fleet Maintenance, Ltd., and

David DePue, that Ms. Craig has failed to provide any specific proofs regarding damages and

should be barred from testifying to same. *Challenges shall be made to expert testimony NOT factual statements*

**PLAINTIFFS' WITNESS, JEROME B. SEGAL** *By Mrs. Craig*

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the

offering of any testimony based on hearsay, speculation and to which he has no personal

knowledge. *at Trial*

**PLAINTIFFS' WITNESS, JEANETTE YOUNG**

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the

offering of any testimony based on hearsay, speculation and to which she has no personal

knowledge. *Trial Brief*

**PLAINTIFFS' WITNESS, MICHAEL PANELLA**

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the

offering of any testimony based on hearsay, speculation and to which he has no personal

knowledge. *at Trial*

**PLAINTIFFS' WITNESS, TANYA L. SEGAL**

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the

offering of any testimony based on hearsay, speculation and to which she has no personal

*at Trial*

knowledge.

**PLAINTIFFS' WITNESS, LAUREN RICCARDI**

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the offering of any testimony based on hearsay, speculation and to which she has no personal knowledge. *at trial*

**PLAINTIFFS' WITNESS, THEODORE R. CRAIG**

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the offering of any testimony based on hearsay, speculation and to which he has no personal knowledge. *at trial*

**PLAINTIFFS' WITNESS, JOHN TISON**

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the offering of any testimony based on hearsay, speculation and to which he has no personal knowledge. *at trial*

**PLAINTIFFS' WITNESS, NEW JERSEY STATE POLICE MAJOR HEIDI SCRIPTURE**

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the offering of any testimony based on hearsay, speculation and to which she has no personal knowledge. *at trial*

**PLAINTIFFS' WITNESS, C. ANTONIA MATTEI, MD**

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the offering of any testimony based on hearsay, speculation and to which he has no personal knowledge. *Trial Brief*

**PLAINTIFFS' WITNESS, DANIEL KOHANSBY, OD**

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the offering of any testimony based on hearsay, speculation and to which he has no personal knowledge.

## PLAINTIFFS' WITNESS, ANDREW LEVY, M.D.

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the offering of any testimony based on hearsay, speculation and to which he has no personal knowledge.

## PLAINTIFFS' WITNESS, DENISE NOVAKY, PH.D

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the offering of any testimony based on hearsay, speculation and to which he has no personal knowledge.

## PLAINTIFFS' WITNESS, JEFFERY BROWN, M.D., J.D., MPH

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the offering of any testimony based on hearsay, speculation and to which he has no personal knowledge.

## PLAINTIFFS' WITNESS, JOHN P. GREENBERG, M.D.

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the offering of any testimony based on hearsay, speculation and to which he has no personal knowledge.

## PLAINTIFFS' WITNESS, DAVID M. MAHALICK, PH.D.

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the offering of any testimony based on hearsay, speculation and to which he has no personal

*At Trial as to all Witnesses*

knowledge.

**PLAINTIFFS' WITNESS, RICHARD SCHUSTER, PH. D.**

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the

offering of any testimony based on hearsay, speculation and to which he has no personal

knowledge. *Daubert & 702 : In Limine*

**PLAINTIFFS' WITNESS PATRICIA WERT:**

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the

offering of any testimony based on hearsay, speculation and to which she has no personal

knowledge. *With drawn*


**As to those Witnesses proposed on behalf of Defendant, J.B. Hunt Transport Inc., J. Ross and David T. Norton:**

**WITNESS, CARL DESENS**

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the

offering of any testimony based on hearsay, speculation and to which he has no personal

knowledge. *at trial*

**LIABILITY EXPERT WITNESS BRUCE KETCHAM** *in Limine*

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the

offering of any testimony based on hearsay, speculation and to which he has no personal

knowledge. Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the

introduction of testimony/opinion of Bruce Ketcham with respect to his determination of

liability/negligence as to Defendants, Lehigh Valley Fleet Maintenance and David DePue. Mr.

60

Ketcham opinion that a potential defect which allegedly "more than likely" existed, is an insufficient means of setting a standard of care in conformity with which Mr. DePue was allegedly obligated to act. Mr. Ketcham offers a factually baseless opinion that tool marks were "more than likely present" on the left rear tandem axle jam nut, simply because they were present on the right side. Mr. Ketcham offers no physical evidence or other proof of the existence of said tool marks. Moreover, Mr. Ketcham fails to discuss whether Defendant DePue would have even seen these tool marks during a mere hubcap replacement. Nonetheless, Mr. Ketcham goes on to opine that if the tool marks existed, and if the wheel bearing endplay and wheel nut torque were found to be out of specification, further inspection and repair could have been done. These statements are clearly speculative and lack physical evidence to support them. Mr. Ketcham fails to establish any professional standard of conduct governing Defendant DePue's actions. J.B. Hunt's expert, Mr. Ketcham, like Plaintiff's expert, Mr. King, fails to cite any industry standards or Department of Transportation regulations that were allegedly violated by these Defendants. Mr. Ketcham's opinions are bare conclusions lacking a factual foundation. As such, all of the opinions expressed by Mr. Ketcham, regarding the potential liability of Defendants, Lehigh Valley Fleet Maintenance and DePue, are speculative conjecture which must be barred by the net opinion rule. Additionally, Mr. Ketcham's opinions are not "the product of reliable principles and methods," as required by Daubert and pursuant to Rule 702.

**WITNESS, KARL KROUT**

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the offering of any testimony based on hearsay, speculation and to which he has no personal knowledge. *at Trial*

61

**WITNESS, NEW JERSEY STATE POLICE OFFICER, JOHN KNERR**

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the

offering of any testimony based on hearsay, speculation and to which he has no personal

knowledge. *Trial Brief*

**PLAINTIFFS' WITNESS, DAVID T. NORTON**

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the

offering of any testimony based on hearsay, speculation and to which he has no personal

knowledge. *at Trial*

**RICARDO Y. MABANTA, M.D. NEUROLOGICAL REGIONAL ASSOCIATES, P.A.**

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the

offering of any testimony based on hearsay, speculation and to which he has no personal

knowledge. *Withdrawn*

**DAVID M. MASUR, PH.D.**

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the

offering of any testimony based on hearsay, speculation and to which he has no personal

knowledge. *Withdrawn*

**IRENE C. MENDELSOHN, M.S., CRC**

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the

offering of any testimony based on hearsay, speculation and to which he has no personal

knowledge. *Withdrawn*

**MARK CHELDER**

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the

*Withdrawn*

offering of any testimony based on hearsay, speculation and to which he has no personal knowledge.

**NORMAN B. SAN AGUSTIN, M.D.**

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the offering of any testimony based on hearsay, speculation and to which he has no personal knowledge. *at Trial*

**As to those  Witnesses proposed on behalf of Defendant, Austin Fleet Maintenance Inc.:**

**LIABILITY EXPERT, WILLIAM J. MEYER** *In Limine*

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the offering of any testimony based on hearsay, speculation and to which he has no personal knowledge. Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the introduction of testimony/opinion of Mr. Meyer with respect to his determination of liability/negligence as to Defendants, Lehigh Valley Fleet Maintenance and David DePue. Mr. Meyer initially opined that the cause of the failure of the wheel retention hardware on the left rear wheel was unknown. In his rebuttal report, Mr. Meyer indicates that one possible theory to explain the cause of the accident was a progressive failure condition. Notably, Mr. Meyer sets forth no physical evidence or factual basis for this theory and he does not test this theory. In fact, Mr. Meyer refrains from even opining as to whether such a condition did or did not exist. Nonetheless, Mr. Meyer indicates that if a progressive failure condition did exist, these Defendants were grossly negligent for failing to observe that condition.  Mr. Meyer also erroneously opines that as of July 12, 2005, the condition would have progressed "90-96% through its development" and evidence of its presence would have been "obvious." However, Mr.

Meyer's naked assertions have no factual basis and simply cannot be proven, or even tested. Mr. Meyer's statements are clearly speculative and lack physical evidence to support them. Mr. Meyer offers no proofs that a progressive failure condition existed and, even if it did exist, how significant the "progressive failure" was at the time DePue performed his 7/12/05 repair. Mr. Meyer also offers no explanation as to how he arrived at the conclusion that if a progressive failure existed, it would have been 90% to 96% through its development when DePue did his repair on 7/12/05. Mr. Meyer fails to establish the professional standard of conduct governing Defendant, DePue. Mr. Meyer does not comment on what duty Defendant, DePue, possessed or what he would have observed when making the repair on July 12, 2005. Nor, does Mr. Meyer cite to any industry standards or applicable Department of Transportation regulations. Mr. Meyer's opinions are bare conclusions lacking a factual foundation. All of the opinions expressed by Mr. Meyer, regarding the potential liability of Defendants, Lehigh Valley Fleet Maintenance and DePue, are speculative conjecture which must be barred by the net opinion rule. Additionally, Mr. Meyer's opinions are not "the product of reliable principles and methods," as required by Daubert and pursuant to Rule 702.

**WITNESS, JAMES ROSS**          *at Trial*

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the offering of any testimony based on hearsay, speculation and to which he has no personal knowledge.

**WITNESS, CARL DESENS**          *at Trial*

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the offering of any testimony based on hearsay, speculation and to which he has no personal

knowledge.

**WITNESS, DAVID T. NORTON**

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the offering of any testimony based on hearsay, speculation and to which he has no personal knowledge. *at Trial*

**WITNESS, KARL KROUT**

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the offering of any testimony based on hearsay, speculation and to which he has no personal knowledge. *at Trial*

**WITNESS, ROBERT McDANIEL**

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the offering of any testimony based on hearsay, speculation and to which he has no personal knowledge.

**WITNESS, ROBERT MELLOT**

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the offering of any testimony based on hearsay, speculation and to which he has no personal knowledge.

*precluded from calling since not produced for deposition during*

**WITNESS, ROBERT SHULL**

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the offering of any testimony based on hearsay, speculation and to which he has no personal knowledge. *discovery*

**WITNESS, NEW JERSEY STATE POLICE OFFICER, JOHN KNERR**

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the *Trial Brief*

offering of any testimony based on hearsay, speculation and to which he has no personal knowledge.

**WITNESS, NEW JERSEY STATE POLICE OFFICER, ERIC HEITMAN**

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the offering of any testimony based on hearsay, speculation and to which he has no personal knowledge. *Parties shall stipulate to authenticity of state police photographs*

**WITNESS, NEW JERSEY STATE POLICE OFFICER, GEOFFREY CLARK**

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the offering of any testimony based on hearsay, speculation and to which he has no personal knowledge. *Trial Brief*

**WITNESS, NEW JERSEY STATE POLICE OFFICER, PAUL SOFHAUSER**

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the offering of any testimony based on hearsay, speculation and to which he has no personal knowledge. *Trial Brief*

**WITNESS, NEW JERSEY STATE POLICE OFFICER, DAN HIGHWELL**

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the offering of any testimony based on hearsay, speculation and to which he has no personal knowledge. *Trial Brief*

**WITNESS, NEW JERSEY STATE POLICE DET. SGT. JAMES KIERNAN**

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the offering of any testimony based on hearsay, speculation and to which he has no personal knowledge. *Stipulation likely*

**MARK CHELDER**

Defendants, Lehigh Valley Fleet Maintenance, Ltd. and David DePue, object to the offering of any testimony based on hearsay, speculation and to which he has no personal knowledge.                                                    *Withdrawn*

**Defendant Austin Fleet Maintenance objects to the following witnesses for the reasons stated:**

AFM joins in and adopts, as if set forth fully herein, defendant, J.B. Hunt's objections to Plaintiffs' witnesses, below.

**Defendant J.B. Hunt Transport, Inc., J. Ross and David Norton object to the following witnesses for the reasons stated:**

Defendants reserve the right to object to any testimony from any witness which is based on hearsay or speculation, matters that are not within the witness's personal knowledge, testimony which lacks a proper foundation, or constitutes an opinion without proper expert qualification(s).

Moreover, the proffered testimony of the following witnesses appears to be cumulative and unnecessary: TROOPER JOHN KNERR, NJ STATE POLICE;  TROOPER ERIC HEITMANN, NJ STATE POLICE;  DET. SGT. JAMES KIERNAN, NJ STATE POLICE;  TROOPER GEOFFREY CLARK, NJ STATE POLICE; SGT. PAUL SOFHAUSER, NJ STATE POLICE; TROOPER C.D. HOLJES, NJ STATE POLICE;  and TROOPER DAN HIGHWELL, NJ STATE POLICE

*Trial Brief*

In addition, the proffered testimony of the following witnesses appears to be cumulative and unnecessary: JEROME B. SEGAL;  JEANETTE YOUNG;  MICHAEL PANELLA;  TANYA L. SEGAL,  LAUREN RICCIARDI;  THEORDORE R. CRAIG;  and JOHN TISON.

TROOPER JOHN KNERR, NJ STATE POLICE                              *in Limine*

Defendants assert that this witness is not qualified to offer opinions or conclusions as to allegedly missing or defective trailer components, and/or maintenance procedures. Defendants also assert that any "violations and summons" issued as a result of this accident are inadmissible at trial.

**TROOPER ERIC HEITMANN, NJ STATE POLICE**              *at Trial*

Defendants object as this witness has not been previously identified as a witness for plaintiffs. Defendants assert that this witness is not qualified to offer opinions or conclusions regarding the accident or the photographs.

**DET. SGT. JAMES KIERNAN, NJ STATE POLICE**       *Stipulation Likely*

Defendants object as this witness has not been previously identified as a witness for plaintiffs. Defendants specifically object to any testimony outside the "chain of custody" of relevant evidence.  Defendants assert that this witness is not qualified to offer opinions or conclusions regarding the accident or the separated tandem wheels, or Mr. Craig's alleged injuries and damages.

**TROOPER GEOFFREY CLARK, NJ STATE POLICE**           *Trial Brief*

Defendants assert that this witness is not qualified to offer opinions or conclusions regarding the accident, or Mr. Craig's alleged injuries and damages outside of his own personal observations.

**SGT. PAUL SOFHAUSER, NJ STATE POLICE**              *Trial Brief*

Defendants assert that this witness is not qualified to offer opinions or conclusions regarding the accident, or Mr. Craig's alleged injuries and damages. Defendants specifically

object to any speculative testimony as to future overtime.

**TROOPER C.D. HOLJES, NJ STATE POLICE**    *Trial Brief*

     Defendants assert that this witness is not qualified to offer opinions or conclusions

regarding the accident, or plaintiff's alleged injuries and damages.

**TROOPER DAN HIGHWELL, NJ STATE POLICE**    *Trial Brief*

     Defendants assert that this witness is not qualified to offer opinions or conclusions

regarding the accident, or Mr. Craig's alleged injuries and damages.

**DEFENDANT, JAMES ROSS**    *at Trial*

     Defendants object to any testimony on matters outside the scope of this witness's personal

knowledge.

**CARL DESENS**    *at Trial*

     Defendants object to any testimony on matters outside the scope of this witness's personal

knowledge, including but not limited to his "role in the subject accident investigation."

**DEFENDANT, DAVID T. NORTON**    *In Limine*

     Defendants object to any testimony on matters outside the scope of this witness's personal

knowledge and/or on matters not relevant to the claims in this case, including but not limited to

Mr. Norton's post-accident medical condition(s) and his "interactions with J.B. Hunt employees

and/or representatives."

~~[redacted line]~~

**LIABILITY EXPERT WITNESS, R. SCOTT KING**    *In Limine & Daubert*

     Mr. King's opinions with regard to J.B. Hunt's conduct, including maintenance program,

inspections, DOT requirements, training and employee oversight fail to comply with the requirements of Rule 702 and are not "the product of reliable principles and methods." Defendants object to any testimony based on hearsay or speculation, or on matters outside the scope of this witness's expertise. Moreover, the witness should be barred from testifying as to matters not contained in his expert report/disclosures as required by the Federal Rules of Civil Procedure.

**MAJOR HEIDI SCRIPTURE, NJ STATE POLICE**          *at Trial*

Defendants assert that this witness is not qualified to offer opinions or conclusions regarding Mr. Craig's alleged injuries and damages, and her testimony must be limited to her own personal observations as a lay witness, without speculation or expert conclusions. It also appears that her anticipated testimony is merely cumulative of that of previously-produced witnesses.

Defendants reserve the right to object to any testimony proffered by medical professionals which is not within their individual area of expertise; not contained in their written reports, does not comply with the Federal Rules of Civil Procedures for expert opinions/reports, and/or for which plaintiffs have not supplied the required Rule 26 disclosures.

**C. ANTONIA MATTEI, M.D.**          *Trial Brief*

As a primary care physician, this witness's testimony should be limited to her own treatment of the plaintiffs, without speculative opinions or conclusions regarding causation, areas of medical speciality, or prognosis or future treatment.

**JEFFREY BROWN, M.D., J.D., MPH**          *In Limine*

Defendants object to any attempt to have this witness testify about plaintiff's alleged "economic losses." Defendants object to any testimony based on hearsay or speculation, or on